752 S.E.2d 907

STATE of West Virginia, Plaintiff Below, Respondent

v.

Joshawa CLARK, Defendant Below, Petitioner.

No. 11–0643.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 25, 2013.

Decided Nov. 26, 2013.

Jason D. Parmer, Esq., Kanawha County Public Defender's Office, Charleston, WV, for Petitioner.

Patrick Morrisey, Esq., Attorney General, Laura Young, Esq., Assistant Attorney General, Charleston, WV, for Respondent.

BENJAMIN, Chief Justice:

Petitioner Joshawa Clark, defendant below, appeals his first degree robbery and conspiracy convictions, for which he was sentenced to serve 52–60 years in prison for twice robbing the Marquee Cinemas in Huntington. Clark alleges that 1) his phone records were obtained in violation of his legitimate expectation of privacy guaranteed by Article III, § 6 of the West Virginia Constitution and thus, the evidence obtained from the subpoena should have been suppressed as fruit of the poisonous tree; 2) even if West Virginians do not enjoy a legitimate expectation of privacy in their cellular phone records, he should have standing to challenge the investigative subpoena; and 3) his phone records were seized pursuant to an illegal subpoena. This Court issued a Memorandum Decision on November 16, 2012, holding Clark's appeal *in abeyance* to permit the circuit court to conduct an evidentiary hearing and enter an appropriate order on the issues of 1) whether the Drug Enforcement Administration ("DEA") properly issued the administrative subpoena under 21 U.S.C. § 876[1] by providing sufficient evidence that the requested information was material and relevant to a drug-related investigation, and 2) whether the DEA properly released and/or shared that information with members of the Huntington Police Department ("HPD") who were required to be engaged in the enforcement of laws related to controlled substances under 28 C.F.R. § 0.103.[2] In the

1. 21 U.S.C. § 876(a) (1988) provides, in relevant part:
 Authorization of use by [U.S.] Attorney General.
 In *any investigation relating to his functions under this subchapter with respect to controlled substances*, listed chemicals, tableting machines, or encapsulating machines, the Attorney General may subpoena witnesses, compel the attendance and testimony of witnesses, and require the production of any records (including books, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds *relevant or material to the investigation* ...
 *Id.* (emphasis added). With respect to those who have authorization to sign and issue DEA subpoenas, 28 C.F.R. Pt. 0, Subpt. R, App. provides the following:
 Issuance of subpoenas. (a) The Chief Inspector of the DEA; the Deputy Chief Inspectors and Associate Deputy Chief Inspectors of the Office of Inspections and the Office of Professional Responsibility of the DEA; all Special Agents-in—Charge of the DEA and the FBI; DEA Inspectors assigned to the Inspection Division; DEA Associate Special Agents-in—Charge; DEA and FBI Assistant Special Agents-in—Charge; DEA Resident Agents-in—Charge; DEA Diversion Program Managers; FBI Supervisory Senior Resident Agents; DEA Special Agent Group Supervisors; those FBI Special Agent Squad Supervisors who have management responsibility over Organized Crime/Drug Program Investigations; and DEA Regional Directors, Assistant Regional Directors, and Country Attachés, are authorized to sign and issue subpoenas with respect to controlled substances, listed chemicals, tableting machines or encapsulating machines under 21 U.S.C. 875 and 876 in regard to matters within their respective jurisdictions.

2. The relevant portion of 28 C.F.R. § 0.103 (2002) provides, in pertinent part:
 (a) The Administrator of DEA is authorized—
 (1) To release information obtained by DEA and DEA investigative reports to Federal, State, and *local officials engaged in the enforcement of laws related to controlled substances.*
 (2) To release information obtained by DEA and DEA investigative reports to Federal, State, and local prosecutors, and State licensing boards, engaged in the institution and prosecution of cases before courts and licensing boards related to controlled substances.
 (Emphasis added).

Memorandum Decision, this Court found that the circuit court had not sufficiently developed the facts at the suppression hearing to make a determination regarding these issues.

In accordance with the direction of the Memorandum Decision upon remand, the circuit court conducted an evidentiary hearing on February 5, 2013, and entered an amended order denying Clark's motion to suppress on February 13, 2013. In his supplemental brief following the circuit court's entry of the amended order on remand, Clark additionally alleges 1) that his phone records were unlawfully subpoenaed under West Virginia law because there was no legal proceeding against Clark; and 2) that his phone records were unlawfully transferred to HPD Officer Cass McMillian because he was not engaged in the enforcement of the law related to controlled substances. Conversely, the State contends that DEA Special Agent Tom Bevins properly issued the administrative subpoena. The State asserts that even if this Court finds that the subpoena was not properly issued, Clark has no reasonable expectation of privacy in the phone records at issue under the Fourth Amendment, and thus, he lacks standing to challenge the subpoena, and that he has failed to state why the exclusionary rule applies. Upon reviewing the supplemental briefs of the parties, the submitted appendix, and the arguments of counsel, this Court concludes that, for the reasons set forth more fully below, the circuit court's amended order denying Clark's motion to suppress should be affirmed.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 13, 2009, the Marquee Cinema in Huntington was robbed at approximately 12:40 a.m.[3] Clark and another theater employee, Zachary Lewis, had finished their shift and were about to leave the cinema when a robber suddenly appeared. Video surveillance of the robbery shows that the robber instructed Clark to use a phone located within the cinema to call the manager and to have him open the door to the count room. Once inside, the robber pointed his gun at the manager and instructed him to fill a bag with money from the safe. Afterwards, the robber was seen exiting down the hallway to the Tenth Street Exit.

HPD Officer Cass McMillian was assigned to investigate the July robbery. Ten days later, on July 24, 2009, DEA Agent Bevins used a DEA administrative subpoena to obtain Clark's cell phone records from Sprint for two days only: July 12–13, 2009. Clark received no notice of this record request or production. The records showed that Clark repeatedly called the phone number of his friend, Dustin Shaver, both immediately before and after the July robbery.[4] The records were limited to the telephone numbers of Clark's incoming and outgoing calls and texts from his cell phone. They did not contain recordings of the calls or texts. Neither Clark nor Shaver were aware that the DEA had obtained this information.

Three months later, the theater was robbed a third time on October 19, 2009, at 11:19 p.m. Clark was also working at the time of the third robbery. Apparently, the robber first went to a movie. When the movie was over, the robber forced, at gunpoint, an employee who was cleaning the theater to go to the concession stand where Clark was working. The robber then made Clark and the worker call the manager and have him open the locked count room. The manager let them in, and after making everyone bind themselves with zip ties, the robber took money from the safe and left the theater. The robber obtained about $5,000. On a video later obtained from Marcum Terrace, the government-subsidized community where Clark and Shaver both lived, both individuals were seen together a few hours

---

3. Earlier in November 2008, the same cinema was also robbed. No arrests were made and that case remains unsolved.

4. The record reflects that Clark called Shaver seven times between 11:54 p.m. on July 12, and 12:38 a.m. on July 13, immediately before the July robbery. Mr. Shaver earlier called Clark five times between 9:14 p.m. and 9:28 p.m. on July 12. Shortly after the robbery, Clark called Shaver three times between 1:56 a.m. and 3:28 a.m., after he finished being questioned at the robbery scene.

later in the early-morning hours of October 20, 2009.

The next day, Officer McMillian showed Jay Maynard, the employee who had been cleaning the theater the night before, and Felicia Gross, who had been working the ticket counter, photo line-ups containing Shaver. Although Maynard was unable to identify any of the photos, Gross identified Shaver. Based upon the information gathered, McMillian sought an arrest warrant charging Shaver with robbery.[5] Two days after the robbery, Clark came into the Huntington Police Station at Officer McMillian's request to speak with him. Clark gave his account of the events but denied involvement in the robberies. On October 21, 2009, the State executed a search warrant on Clark's home and recovered a safe which contained the pink Nike bag used by Shaver in the October 2009 robbery. The safe also contained $4,600, and the certificate of title for Clark's new motorcycle. The title revealed that Clark purchased the motorcycle on July 21, 2009, one week after the earlier robbery. Clark paid $2,750.00 cash for the motorcycle.

At the preliminary hearing held on October 29, 2009, Officer McMillian testified that after determining that Clark had worked on the night of both the July 2009 robbery and the October 2009 robbery, he obtained Clark's cell phone records for two dates through a subpoena. He testified that the police department began looking at the numbers that Clark had called on July 12, 2009, and July 13, 2009, and determined that there was one number that was reoccurring within minutes of each other on the night of the robbery. After obtaining another subpoena for the number in question, the number was found to belong to Dustin Shaver. McMillian testified that following that, the police department started an investigation of Clark and Dustin Shaver to determine how they were connected. The police department learned that they were good friends in school. McMillian testified that the police department also began following Clark periodically to see where he was going, but nothing of any value was learned from their

observations until the third robbery in October 2009.

On January 14, 2010, Clark and Shaver were indicted on two counts of first degree robbery, two counts of conspiracy, and two counts of kidnapping based upon the July 2009 and October 2009 robberies of the movie theater.[6] On June 24, 2010, Clark filed a motion to suppress the cell phone records on the grounds that the information had been illegally obtained through a DEA subpoena. Clark sought to suppress all evidence flowing from the subpoena as fruit of the poisonous tree. Clark argued that the cell phone records were used initially as a "fishing expedition" in hopes of obtaining information upon which the local police could further their investigation. He asserted that the records were obtained without probable cause and without a valid warrant or subpoena. Clark contended that although the purported need for the subpoena was that the records were part of a drug investigation, i.e., for violations of 21 U.S.C. § 801, *et seq.*, the supposed drug investigation was really fraudulent and the HPD was merely attempting to avoid proper legal procedures to access the records. Clark argued that in fact there was no drug-related crime being investigated, as required by 21 U.S.C. § 876(a) (2011), the authorizing statute for DEA subpoenas. Clark also argued that the Fourth Amendment to the United States Constitution required advance notice to the person whose privacy interests may be at stake before the issuance and/or execution of such a subpoena, so that the targeted person would have the opportunity to seek a judicial determination as to whether or not the requested search is within the authority of the agency and whether the information is reasonably relevant.

At the suppression hearing on August 2, 2010, no witnesses testified. Clark relied on the preliminary hearing testimony of Officer McMillian to support his assertion that drugs were not the basis of the subpoena. The State responded by proffering, for the first time, that HPD Officer J.T. Combs, not McMillian, initiated the investigation. The

---

5. Officer McMillian did not believe that he had sufficient evidence to charge Clark at that time.

6. The trial court dismissed the kidnapping counts prior to trial.

State proffered that Officer Combs worked with the ATF task force. According to the prosecutor's proffers, Officer Combs also worked at the Marquee Cinema as a moonlight-type job, and while doing so, he observed that Clark had a lot of new personal property. The State further proffered that Officer Combs began talking to cinema personnel regarding where Clark had gotten these things, and that's how the investigation supposedly began and where the probable cause began. The State also proffered that there was a video of Clark and Dustin Shaver at Marcum Terrance together in the hours just after the July robbery.[7] When the court asked how the State would respond to Clark's argument that the subpoena should only be used in drug related cases, the State responded that, "[w]ell, they didn't know at the time what they were dealing with. They didn't know if it was a drug related case at the time they initiated the subpoena." The circuit court then stated, "[o]kay. Anything else?" State's counsel replied, "[t]hat's all."

On September 30, 2010, the circuit court entered an order denying Clark's motion to suppress. Following a dispute between the parties about whether certain facts contained within the circuit court's order were actually presented at the suppression hearing, the circuit court entered an amended order denying the motion to suppress on March 9, 2011, which deleted the disputed facts. Trial was conducted on February 8, 9, and 10, 2011. Co-defendant Shaver testified against Clark, indicating that they both came up with the idea of robbing the theater in July and October and Clark acted as the inside man and Shaver performed the actual robberies. The jury returned a guilty verdict. Clark subsequently filed his Petition for Appeal. This Court issued a Memorandum Decision on November 16, 2012, holding Clark's appeal *in abeyance* for the limited purpose of permitting the circuit court to conduct an evidentiary hearing and enter an appropriate order on the issues of whether the DEA properly issued the administrative subpoena, and whether the DEA properly released and/or

shared that information with members of the Huntington Police Department who were engaged in the enforcement of laws related to controlled substances.

*Procedural History following Remand*

At the February 5, 2013, evidentiary hearing on remand from this Court, the circuit court heard the testimony of Officer Combs, DEA Agent Bevins, and Officer McMillian. Officer Combs testified that at the time of the July 2009 and October 2009 robberies, he was a narcotics and firearms investigator with the Huntington Police Department and a task force officer with the ATF. He also worked part-time security for the Marquee cinema at that time. He began moonlighting for the cinema after the first robbery occurred in November 2008. Officer Combs testified that when working at the cinema, he became suspicious of Clark when he observed Clark with what appeared to be a new motorcycle, jacket and helmet because he knew that Clark's part-time job at the cinema was his only employment and that he lived at Marcum Terrance, a government subsidized community where a lot of drug and criminal activity occurs. Officer Combs stated that he questioned the cinema manager about Clark's new items and was told that Clark had received money from the military for signing up. He also testified that he spoke with the assistant manager at the cinema that same day, who told him that he thought Clark was earning income by selling marijuana. He stated that he later learned from Detective McMillian that Clark had not gotten the money from the military.

Officer Combs testified that he relayed that information to DEA Agent Bevins and informed him that he thought Clark might be involved in the robberies and drug activity. He said he then asked Agent Bevins to issue a subpoena to obtain Clark's cell phone records. He testified that he was present when the subpoena was prepared. However, he believed that once the records were obtained by Bevins, they were sent directly to the Detective Unit to Officer McMillian, who in-

---

7. The State misstated the evidence, however, because the video of Clark and Shaver together at Marcum Terrace was from the hours just after the October robbery, not the night after July robbery. Clark's phone records were seized two months before the October 2009 robbery occurred.

vestigated the robbery. He testified that once the records were received he did not look at them. Later, he testified that he wasn't sure if he looked at them or not. He testified that he did not prepare any of the evidence that went to the Grand Jury in this case and he admitted that he was not assigned to investigate Clark for drugs. He was also not assigned to investigate the robbery because he was a Narcotics and Firearms investigator at the time of the July 2009 and October 2009 robberies. He testified that because he was a police officer, and because he worked at the cinema, he passed along whatever information he had to the investigator handling the robbery case. He stated that in his mind, he believed that it was an active case that Clark could be dealing drugs. However, there was no official open State or federal case related to Clark and drugs at that time. Officer Combs testified that he spent time following Clark after the robbery and never found any evidence related to drugs.

DEA Agent Bevins testified that his duties include investigating drug crimes on state and federal levels. He was part of the DEA Task Force with the Huntington Police Department and with the Bureau of Alcohol, Tobacco and Firearms that investigated violent crimes and narcotic crimes in the area, two types of crimes that are often linked together. He testified that Officer Combs was the leader of the joint Task Force and had federal deputation with the ATF and that Officer Curt Nethercutt, another detective with the Huntington Police Department, also had federal deputation with the DEA. As part of the drug and violent crime investigations, it was common to request administrative subpoenas duces tecum for phone records. He stated that "with DEA having the power to give administrative subpoenas we would do an administrative subpoena. I don't believe ATF was able to do that, and we would issue the subpoenas through our organization. . . . It is an administrative subpoena and all we had to have for us is a drug nexus." Agent Bevins testified that under federal law, the test for issuing such subpoena duces tecum is only that the records be relevant or material, rather than a probable cause requirement. No judicial officer ever

reviews an administrative subpoena. Such subpoenas are issued purely at the discretion of the DEA.

Agent Bevins testified that Officer Combs asked him to subpoena Clark's phone records because Combs had suspicions that Clark was involved in marijuana trafficking. When Agent Bevins was questioned regarding why only the two dates surrounding the robbery, July 12 and 13, 2009, were used in the subpoena's request for records, instead of using many days as might be more appropriate for a drug investigation, he first stated, "I have learned over my time not to do it for ninety days. I try to do it within thirty days or two weeks because you get too much information." Agent Bevins eventually admitted that he knew the subpoena request involved only the two days surrounding the robbery, but claimed that "[w]e were going to work both cases. And if it had proved to be a bigger drug investigation, I would have hoped to have took it up the street or assisted here in the state system in a drug/robbery/marijuana distribution crew."

Bevins stated that once Sprint provided the phone records, he looked at them and then provided them to Officer Combs, who he believed was "the lead on the drug investigation." The phone records revealed that Clark had called one phone number frequently, that belonging to Dustin Shaver, so Agent Bevins issued an administrative subpoena for Shaver's phone number as well on July 24, 2009. That subpoena requested phone records for dates only between July 11, 2009, and July 14, 2009, two days on either side of the robbery date. Agent Bevins asserted that they chose to subpoena two more days of Shaver's phone records than Clark's in furtherance of a drug investigation. Bevins stated, "just like any drug investigation, I would locate the most common number and I would have believed that would be the source person they had most contact with."

Officer McMillian testified during the February 5, 2013 evidentiary hearing that he was the HPD Officer who presented the robbery case to the Grand Jury. He testified that he did not believe any drug related information was presented to the Grand Jury in bringing

charges against Clark. Officer McMillian testified that "it was a joint investigation with myself, who worked Persons Crimes, through the Drug Task Force of the Huntington Police Department, through our SEU—SEI Unit that we have. It was a joint investigation. It wasn't just me working the case." He testified that the investigation began in November 2008, after the first robbery. He investigated all three of the robbery scenes. When asked whether he suggested that Clark's cell phone records be requested, he stated "I am sure I—we did, whenever we set [sic] down and all of us talked together." He stated that he first reviewed Clark's phone records when they were placed in his Departmental mailbox. He also testified that "the reason the phone records were obtained was because of the connections of the people—him being in the cinema ... With Joshawa. Him being there every time." He took statements from Clark at the scene. He admitted that he did not testify at trial regarding any involvement of drugs. He went on to state that he did not have any knowledge of what Officer Combs learned about possible drug involvement and what information Combs gave Agent Bevins to justify issuance of the subpoena. He stated that he worked on the robbery part of the investigation while Officer Combs and others worked on the drug part. He testified that later, the various officers and agents shared the phone records because it was a joint investigation. He then stated that he did not request the subpoena.

On February 13, 2013, the circuit court entered its "Amended Order Denying Defendant's Motion to Suppress." In that order, the circuit court found that the DEA administrative subpoena and subsequent cell phone records obtained by Agent Bevins were properly authorized under 21 U.S.C. § 876. Specifically, the circuit court found that Officer Combs had obtained information from one of the Marquee Cinema managers that it was believed that Clark was involved in the sale of marijuana, and that Combs had provided this information to Agent Bevins as a basis for the subpoena. Based on this, the circuit court concluded that the information was material and relevant to a drug-related investi-

gation at the time the DEA subpoena was issued.

Additionally, the circuit court found that as a result of the administrative subpoena issued on July 21, 2009, and pursuant to 28 C.F.R. § 0.103, the DEA properly released and shared the information obtained with the Huntington Police Department. The circuit court noted that Officer Combs considered the matter to be an active drug investigation and that he spent time following the defendant in furtherance of the drug investigation, but no further evidence was developed. The circuit court found that Combs, in his dual capacity as a federally sworn ATF agent and Huntington Police Department officer, was in a unique position whereby he obtained information sought for a drug-related matter that could assist other officers in their investigation of the robbery. The circuit court also noted Bevins' testimony that it was common practice to investigate matters as a team and to use the administrative subpoena power to subpoena phone records while investigating individuals or groups of people believed to be involved in drug activity as well as violent crimes, such as robberies. The circuit court concluded that it was proper for Agent Bevins to share this information with Officer Combs due to the Joint Task Force participation, and proper for the phone records to be shared with the detective investigating the robbery. Thus, the circuit court concluded that Clark had failed to establish a basis for the suppression of the phone records.

## II.

### STANDARD OF REVIEW

The standard of review of a circuit court's ruling on a motion to suppress is well defined in this State. *See State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994) (discussing at length the standard of review in a suppression determination). We have held that

> By employing a two-tier standard, we first review a circuit court's findings of fact when ruling on a motion to suppress evidence under the clearly erroneous standard. Second, we review *de novo* questions of law and the circuit court's ultimate

conclusion as to the constitutionality of the law enforcement action. Under the clearly erroneous standard, a circuit court's decision ordinarily will be affirmed unless it is unsupported by substantial evidence; based on an erroneous interpretation of applicable law; or, in light of the entire record, this Court is left with a firm and definite conviction that a mistake has been made. *See State v. Stuart,* 192 W.Va. 428, 452 S.E.2d 886, 891 (1994). When we review the denial of a motion to suppress, we consider the evidence in the light most favorable to the prosecution.

*State v. Lilly,* 194 W.Va. 595, 600, 461 S.E.2d 101, 106 (W.Va.1995)(footnote omitted). This Court further has explained:

When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

Syl. pt. 1, *State v. Lacy,* 196 W.Va. 104, 468 S.E.2d 719 (1996). With these standards in mind, we proceed to consider the merits of Clark's appeal.

### III.

### DISCUSSION

■ Clark alleges that his phone records were obtained in violation of his legitimate expectation of privacy guaranteed by Article III, § 6 of the West Virginia Constitution and thus, the evidence obtained from the subpoena should have been suppressed as fruit of the poisonous tree. Alternatively, he alleges that even if West Virginians do not enjoy a legitimate expectation of privacy in their cellular phone records, he should have standing to challenge the investigative subpoena, as his phone records were seized illegally.

In his supplemental brief, Clark alleges that his phone records were unlawfully trans-ferred to Officer McMillian because Officer McMillian was engaged only in a robbery investigation, not in the enforcement of the law related to controlled substances. Further, Clark maintains that when Officer Combs requested the subpoena, he was not really acting as a drug enforcement officer but rather that he was acting as cinema security or as a conduit between Agent Bevins and Officer McMillian so that Officer McMillian could use Clark's phone records in the robbery investigation. Clark contends that Officer Combs himself never used the phone records in his purported drug investigation.

Clark also argues that prior to February 5, 2013, the State never mentioned that Combs had information that Clark was selling marijuana. Clark asserts that this makes Combs' testimony appear less credible on this point. Clark alleges that if Combs really had information in July 2009 from the assistant manager at the cinema that Clark was selling marijuana, there is no doubt that he would have informed the State of this, and that it would have been included in the prosecutor's proffer of facts to the court during the 2010 pretrial hearings. Clark contends that under the circumstances, it appears that Officer Combs' lately-claimed investigation of Clark's marijuana dealings is nothing more than a retroactive attempt by the State in order to justify the unlawful transfer of phone records to McMillian.

To the contrary, the State asserts that at all times relevant to this matter, Officer Combs was a deputized federal agent working as a narcotics agent for a joint federal-state task force. This task force was set up, in part, to merge the resources of state and federal law enforcement. The DEA Administrator was authorized under 28 C.F.R. § 0.103(a)(2) to release information obtained by the DEA and DEA investigative reports to federal, state, and local prosecutors related to any controlled substances. *See also* 21 U.S.C. § 873(a) (2006); 21 U.S.C. § 873(a)(1) (2006). The State asserts that even if this Court finds that the phone records at issue were illegally obtained, Clark has failed to state why such records should be excluded.

After thoroughly reviewing the record herein, we find ourselves disturbed by the conduct of the Huntington Police Department in this matter. From our review of the testimony presented during the February 5, 2013, evidentiary hearing, it is apparent that Officer Combs did not request Agent Bevins to issue the DEA subpoena of Clark's phone records for the purpose of furthering a drug-related investigation. As previously stated, the DEA subpoena at issue requests cell phone records for only two specific days, July 12–13, 2009, the two days immediately surrounding the July 13, 2009 robbery. There was no attempt to obtain multiple days of records as would be needed in a bona-fide drug investigation. Struck by the fact that the validity of the subpoena was suspicious on its face due to the exceedingly brief time periods for which records were requested, and having no evidence presented on the record below to explain this, this Court provided the State an opportunity on remand to explain in some believable manner the reasons why Officer Combs and Agent Bevins chose to subpoena records for only these two dates. We find that the State failed to put forth a believable alternative explanation for this time period limitation.

When Agent Bevins was questioned regarding why the two dates surrounding the robbery, July 12 and 13, 2009, were used in the subpoena's request for records, he admitted that he knew the subpoena request involved the two days surrounding the robbery, but explained that "[w]e were going to work both cases. And if it had proved to be a bigger drug investigation, I would have hoped to have [taken] it up the street or assisted here in the state system in a drug/robbery/marijuana distribution crew." However, despite the fact that this joint task force supposedly planned to investigate both the robbery and possible drug activity, Combs' testimony reveals that once the records were obtained, he never looked at them, even though he was, according to Bevins, the "lead on the drug investigation." Rather, Combs testified that the records were directed to Officer McMillian, the robbery investigator. Although Combs claimed that in his mind, he believed that there was an active investigation to determine if Clark could be dealing drugs, we conclude that if Combs was truly engaged in the enforcement of laws related to drugs at the time the subpoena was issued, there is no question that he would have received the phone records once they were obtained and that he would reviewed them to further his drug investigation. We find Officer Combs' lack of interest in the records particularly odd and revealing, given the fact that he claims he spent time following Clark after the robbery specifically to "investigate a drug connection." [8] In addition, all of this testimony presented at the February 5, 2013 evidentiary hearing represents the fourth time that the State's explanation has shifted regarding the issuance of the DEA subpoena. Specifically, the testimony contradicts earlier testimony taken during the preliminary hearing, the suppression hearing held on August 2, 2010, and the trial in this matter.[9]

---

8. Interestingly, the evidentiary hearing record also reveals that Agent Bevins testified that in issuing the DEA subpoena for Clark's phone records, Clark was not even given his own case number but rather, Clark was put under an *unrelated* Federal case that was previously opened. Bevins admitted during cross-examination that this other Federal case had nothing to do with Clark. When asked why Clark wasn't given a case number, Bevins testified that he "would have to have done a case opening, which is a long process." He then stated that as the case would have progressed, if he would have continued to be involved, he would have opened a case number on Clark. Although we find it interesting that Bevins put Clark's subpoena under an unrelated case number, we do not maintain, although Clark contends, that a case was required to be pending at the time the federal DEA subpoena was issued. Although this Court recently held in syllabus points 1 and 2 of *State v. McGill*, 230 W.Va. 569, 741 S.E.2d 127 (2013) that the subpoena authority under W. Va.Code § 57–5–4 (1990) and Rule 17 of the West Virginia Rules of Criminal Procedure requires a legal proceeding be pending in order for a subpoena duces tecum to issue, we acknowledge that the broad federal administrative subpoena power contained 21 U.S.C. § 876 is not subject to the same statutory limitations.

9. At the preliminary hearing held on October 29, 2009, Officer McMillian presented no evidence regarding any suspicion of drug activity. Rather, McMillian testified that after determining that Clark had worked the night of both the November 2008 robbery and the July 2009 robbery, he obtained his cell phone records through a sub-

In light of the fact that Combs admitted that he never looked at the records once they were obtained in furtherance of a drug investigation, but rather that the records were sent directly to Officer McMillian, the detective in charge of the robbery investigation, and the highly suspect dates for which the subpoena requested Clark's records, we conclude that Officer Combs did not properly request that Agent Bevins issue the DEA subpoena of Clark's phone records for the purpose of furthering a drug-related investigation.[10] Accordingly, we conclude that the circuit court's findings of fact regarding the HPD's actions relating to the issuance of the DEA subpoena are clearly erroneous as they are not supported by the substantial evidence in the record.

 Clark maintains that because the Huntington police acted improperly toward the DEA in obtaining his phone records, the records should have been excluded because he possesses a constitutionally protected legitimate expectation of privacy in his phone records. The State counters that Clark has no constitutionally protected legitimate expectation of privacy in his phone records and thus, the exclusionary rule does not apply in this case. With regard to the exclusionary rule, this Court has stated, "[w]hen evidence

---

poena. The police department began looking at the numbers that Clark had called on July 12, 2009, and July 13, 2009, and determined that there was one number that was reoccurring within minutes of each other on the night of the robbery. After obtaining another subpoena for the number in question, the number was found to belong to Dustin Shaver. McMillian testified that following that, the police department started an investigation of the Clark and Dustin Shaver to determine what their connections were. The police department learned that they were good friends in school. McMillian testified that the police department began following Clark periodically to see where he was going, but nothing of any value was learned from their observations until the third robbery in October 2009.

At the suppression hearing on August 2, 2010, no witnesses testified. Clark argued that the subpoena was invalid because the case had no drug involvement, as required by federal statute. Clark relied on the preliminary hearing testimony of Officer McMillian to support his assertion that drugs were not the basis of the subpoena. The State responded by proffering that Combs, not McMillian, initiated the investigation. The State proffered that Officer Combs, a Huntington police officer, worked with the ATF task force and also worked over at the Marquee Cinema as a moonlight-type job, and he observed that Clark had a lot of new personal property. The State further proffered that Combs began talking to cinema personnel regarding where Clark had gotten these things, and that's how the investigation began and where the probable cause began. When the court asked how the State would respond to Clark's argument that the subpoena should only be used in drug related cases, the State responded that, "[w]ell, they didn't know at the time what they were dealing with. They didn't know if it was a drug related case at the time they initiated the subpoena." The circuit court then stated, "[o]kay. Anything else?" State's counsel replied, "[t]hat's all." On September 30, 2010, the circuit court entered an order denying Clark's motion to suppress.

At trial, Officer McMillian gave a totally different reason why a DEA subpoena was used. The following discussion took place at trial between Officer McMillian and Jason Goad, counsel for defendant:

Q: So, why did you purport that this was a drug case and a Federal case? Or why didn't you go through the proper channels to get a subpoena in this matter?
A: We turned around at the time these records were issued. We thought that Marquee Cinemas—we know they are based in other places other than Huntington, West Virginia. And we turned around and we had discussed it. We felt that this may go Federal as a Federal case.
Q: But not a drug case? This is specifically for drug cases; right?
A: What's that?
Q: This subpoena form was under a Federal Drug Enforcement Act?
A: I don't know what Act it was under because I didn't file for the records.
Q: Tom Bevins did?
A: We—Tom Bevins did.
Q: And he is a DEA Agent; right?
A: Yes, sir.
Q: So, you had the DEA involved in a non-drug case?
A: We went because we were looking at an interstate case of this being a multi-state business to where the Federal Government may be able to pick this up.
Q: Why would you do that when only one theatre was robbed here in Cabell County? Herein West Virginia? Why would you get the Feds involved?
A: Because we figured it was a stiffer penalty, if it was a company that was based in other states and it was one of their businesses the penalty was stiffer if we could have taken it to the Federal level.

10. In so concluding, however, we do not conclude that DEA Agent Bevins acted unlawfully. Rather, it appears that the DEA acted in good faith based upon the improper representations of Combs.

is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull,* 480 U.S. 340, 347, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). *See Illinois v. Rodriguez,* 497 U.S. 177, 183, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (Under the exclusionary rule "no evidence seized in violation of the Fourth Amendment [can] be introduced at [a defendant's] trial unless he consents."). Herein, the State argues that the exclusionary rule is a judicially created doctrine which was designed to deter police misconduct, and to protect citizen's privacy rights under the Fourth Amendment. *United States v. Leon,* 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ("[T]he exclusionary rule is designed to deter police misconduct...."). The State contends that the exclusionary rule is inapplicable because Clark had no reasonable expectation of privacy in the phone records obtained under the Fourth Amendment to the United States Constitution pursuant to *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), and under the West Virginia Constitution, Article III, section 6. We agree.

▆▆▆ Both "[t]he Fourth Amendment of the *United States Constitution*[11] and Article III, Section 6 of the *West Virginia Constitution*[12] protect an individual's reasonable expectation of privacy." Syl. pt. 7, *State v. Peacher,* 167 W.Va. 540, 280 S.E.2d 559 (1981) (footnotes added). "A claim of protection under the Fourth Amendment and the right to challenge the legality of a search depends not upon a person's property right in the invaded place or article of personal property, but upon whether the person has a legitimate expectation of privacy in the invaded place or thing." *Wagner v. Hedrick,* 181 W.Va. 482, 487, 383 S.E.2d 286, 291

(1989) (citing *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). If a person is in such a position that he cannot reasonably expect privacy, a court may find that an unreasonable Fourth Amendment search has not taken place. *Id.*

Longstanding United States Supreme Court precedent makes it clear that there is no reasonable expectation of privacy that attaches to the phone records at issue herein under the Fourth Amendment to the United States Constitution. *Smith,* 442 U.S. 735, 745–46, 99 S.Ct. 2577. In *Smith,* the United States Supreme Court held that the installation of a pen register which revealed the phone numbers called by the defendant did not constitute a search under the Fourth Amendment. *Id.*

▆▆▆ Clark acknowledges herein that *Smith* precludes him from asserting that he maintains a legitimate expectation of privacy under federal law, but he urges this Court not to follow the approach used in *Smith* and rather find that the West Virginia Constitution recognizes a broader protection of a person's legitimate expectation of privacy. In most cases, this Court has ruled that the protections afforded West Virginia citizens under the search and seizure provisions of our State Constitution are co-extensive with those provided for in the Fourth and Fourteenth Amendments to the United States Constitution. *See Rogers v. Albert,* 208 W.Va. 473, 479, 541 S.E.2d 563, 569 (2000) ("This Court has customarily interpreted Article III, § 6 of the West Virginia Constitution in harmony with federal case law construing the Fourth Amendment."); *State v. Andrews,* 91 W.Va. 720, 727, 114 S.E. 257, 260 (1922) (Article III, section 6 of the West Virginia Constitution is "substantially the same" as the Fourth Amendment to the Federal Constitution); *State v. Duvernoy,* 156

---

**11.** The United States Constitution, Amend. IV, provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

**12.** The West Virginia Constitution, Article III, section 6 provides that "[t]he rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated. No warrant shall issue except upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, or the person or thing to be seized."

W.Va. 578, 582, 195 S.E.2d 631, 634 (1973) ("This Court has traditionally construed Article III, section 6 in harmony with the Fourth Amendment."); *State v. Bruner*, 143 W.Va. 755, 766, 105 S.E.2d 140, 146 (1958) ("The provisions of [Article III, section 6 of] the West Virginia Constitution being substantially the same as the pertinent provisions of the United States Constitution, 'should be given a construction in harmony with the construction of the federal provisions by the Supreme Court of the United States.'" (quoting *Andrews*, 91 W.Va. at 727, 114 S.E. at 260)).

Although this Court recently recognized that "[t]he provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protections than afforded the Federal Constitution" when we diverged from Federal Fourth Amendment precedent to protect conduct occurring inside a defendant's home in *State v. Mullens*, 221 W.Va. 70, 650 S.E.2d 169 (2007) (finding that this state has a long history of protecting its citizens from unfettered state intrusion into the privacy of a citizen's home, and that the Supreme Court's prior decisions on this issue did not reflect the same approach to the issue), our holding in *Mullens* was compelled by the circumstances of that particular case. Indeed, we warned that "[o]ur decision has no impact on the authority of the police to place a body wire on an informant to record communications with a suspect *outside* a suspect's home." *Mullens*, 221 W.Va. at 90, n. 45, 650 S.E.2d at 189, n.

45 (emphasis added). This Court has never held that Article III, section 6 applies to the type of telephone records at issue in this case. Nor has this Court ever held that Article III, section 6 would requires us to depart from the Supreme Court precedent in *Smith*. Based upon the facts that are placed before the Court in this case, we see no reason to depart from *Smith* on this issue.[13] Accordingly, we hold that individuals possess no reasonable expectation of privacy in the telephone numbers they dial under Article III, Section 6 of the West Virginia Constitution. Because Clark has no legitimate expectation of privacy in his phone records under federal and state law, we decline to apply the exclusionary rule as a basis to suppress the phone records.

 Next, Clark asserts that even if he does not enjoy a legitimate expectation of privacy, he should have standing to challenge the subpoena. The State contends that a state court, including this Court, may not quash a federal administrative subpoena under some unarticulated inherent power because the validity of the subpoena itself is an issue for the federal court to decide. *See Administrative Subpoena Walgreen Co. v. U.S. Drug Enforcement Admin.*, 913 F.Supp.2d 243 (E.D.Va.2012) ("From the text of [§ 876(c) ], it is clear that it provides the Attorney General with the right to invoke federal district court jurisdiction to enforce an administrative subpoena.").[14] We agree

**13.** We observe that Alabama, Georgia, Kansas, Maryland, North Carolina, North Dakota, Oklahoma, and South Carolina follow the Supreme Court's holdings in *Smith* and *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (individuals possess no legitimate expectation of privacy in financial information they voluntarily supply to banks). *See Henderson v. State*, 583 So.2d 276, 292 (Ala.Crim.App.1990) (telephone records gathered by subpoena were not defendant's property, and he has no legitimate expectation of privacy in their content); *Kesler v. State*, 249 Ga. 462, 291 S.E.2d 497, 504 (1982) (no reasonable expectation of privacy in telephone records); *State v. Schultz*, 252 Kan. 819, 850 P.2d 818, 823–24 (1993) (no reasonable expectation of privacy in bank or telephone records obtained by law enforcement by subpoena pursuant to *Miller* and *Smith* ); *Smith v. State*, 283 Md. 156, 389 A.2d 858, 868 (1978) (no constitutionally protected reasonable expectation of privacy in the numbers dialed into a telephone

system); *State v. Melvin*, 86 N.C.App. 291, 357 S.E.2d 379, 382 (1987) (no reasonable expectation of privacy in defendant's bank records pursuant to *Miller* ); *State v. Lind*, 322 N.W.2d 826, 836–37 (N.D.1982) (defendant has no reasonable expectation of privacy in his telephone records); *McAlpine v. State*, 634 P.2d 747, 749 (Okla.Crim. App.1981) (no reasonable expectation of privacy in bank records under *Katz* and *Miller;* state may obtain without search warrant or showing of probable cause); *S. Bell Tel. & Tel. Co. v. Hamm*, 306 S.C. 70, 409 S.E.2d 775, 779–80 (1991) (no expectation of privacy in telephone numbers dialed pursuant to *Smith* ).

**14.** To enforce compliance, it is necessary for the United States Attorney to bring an enforcement action in federal district court:

In the case of contumacy by or refusal to obey a subp[o]ena issued to any person, the Attorney General may invoke the aid of any court of the United States within the jurisdiction of which

with the State to the extent that the validity of the administrative subpoena is questioned and find that Clark does not have standing to question the validity of the subpoena in a state court proceeding.

 Our inquiry, however, does not end there. While we acknowledge that issues related to the enforcement of the DEA subpoena would indeed be a matter for a federal court, not a state court, to decide especially if Clark had been charged with a violation of a federal controlled substance law, here we are faced with the unique circumstance where a *local* law enforcement officer improperly sought and obtained a federal DEA subpoena for the purposes of conducting a *state* robbery investigation and of prosecuting a suspect in a West Virginia *state* circuit court with information garnered from such improper *state* actions. The State here fails to distinguish between the improper actions by state actors in seeking and obtaining a valid administrative subpoena and the subpoena itself. While we would have no issue with the State's use of records obtained through a

*legitimately obtained* DEA subpoena if a violation of state law also happened to be discovered in the process of investigating a federal drug crime; here, the record leaves us no doubt but that the Huntington police officer who requested that the DEA issue the subpoena for the records did so knowing that this was a state robbery, not a drug case. He purposefully misused the federal administrative subpoena procedure to shortcut the procedural requirements for appropriately obtaining a search warrant for the phone records from a state judicial officer. Unquestionably, the prosecution of this case has been tainted by the Huntington police department's egregious conduct.

Although we have acknowledged that the State's misconduct does not itself violate Clark's constitutional rights, we are confronted by a State prosecution which seeks to implicate the court system in this misconduct by ignoring the HPD's actions. We will not place our imprimatur on the wrongdoings of the State in this case by simply looking the other way. The integrity of the judicial pro-

the investigation is carried on or of which the subp[o]enaed person is an inhabitant, or in which he carries on business or may be found, to compel compliance with the subp[o]ena. The court may issue an order requiring the subp[o]enaed person to appear before the Attorney General to produce records, if so ordered, or to give testimony touching the matter under investigation. Any failure to obey the order of the court may be punished by the court as a contempt thereof. All process in any such case may be served in any judicial district in which such person may be found. 21 U.S.C. § 876(c). Under § 876(c), an administrative agency has the power to file an enforcement action in, "any court of the United States." (emphasis added).

In *Doe v. United States*, 253 F.3d 256, 263–64 (6th Cir.2001), the United States Court of Appeals for the Sixth Circuit distinguished between information gathered by warrant upon a finding of probable cause and compelled disclosures of records pursuant to administrative subpoenas. "Whereas the Fourth Amendment mandates a showing of probable cause for the issuance of search warrants, subpoenas are analyzed only under the Fourth Amendment's general reasonableness standard." The Court went on to explain, "[o]ne primary reason for this distinction is that, unlike 'the immediacy and intrusiveness of a search and seizure conducted pursuant to a warrant[,] the reasonableness of an administrative subpoena's command can be contested in federal court before being enforced." *Id.* at 264

quoting *In re Subpoena Duces Tecum*, 228 F.3d 341, 347–49 (4th Cir.2000). *See also United States v. Bailey*, 228 F.3d 341 (4th Cir.2000). This principle extends to third parties—that is entities other than the subject of the investigation. *See United States v. Phibbs*, 999 F.2d 1053, 1077 (6th Cir.1993).

When DEA administrative subpoenas are issued to third parties pursuant to 21 U.S.C. § 876(a), a defendant may demonstrate standing only when he can show "a legitimate expectation of privacy attaching to the records obtained." *United States v. Phibbs*, 999 F.2d 1053, 1077 (6th Cir.1993). *See also United States v. Bynum*, 604 F.3d 161, 164 (4th Cir.2010) (defendant had no reasonable expectation of privacy in subscriber information, i.e. his name, email address, telephone number, and home address, obtained by administrative subpoena). Federal courts have denied third-party standing to challenge the constitutionality of and statutory authority for the government's use of administrative subpoenas under 21 U.S.C. § 876(a) to issue administrative subpoenas in "investigations." *See, e.g., United States v. Plunk*, 153 F.3d 1011 (9th Cir.1998) amended by 161 F.3d 1195 (9th Cir.1998), *abrogated on other grounds by United States v. Hankey*, 203 F.3d 1160, 1169 n. 7 (9th Cir.2000); *United States v. Moffett*, 84 F.3d 1291, 1293–94 (10th Cir.1996). (Section 876 was "written to give the DEA broad powers to investigate violations of federal drug laws" and "provides no express right to challenge the Attorney General's subpoenas issued under it.").

cess demands and expects more. It is the inherent authority of the Supreme Court of Appeals to protect the integrity of the Court and the judicial process, and to regulate the type of evidence that is admitted into judicial proceedings when the integrity of the criminal justice system is threatened by the improper or unlawful acts of the State.[15]

■ "Since 1943, the federal courts have excluded evidence from federal criminal prosecutions under the authority of their supervisory power over the administration of the criminal justice system." Brady, Matthew, *A Separation of Powers Approach to the Supervisory Power of the Federal Courts*, 34 Stan. L.Rev. 427 (1982). "Under the aegis of this supervisory power, courts can exclude evidence that federal police investigators obtain improperly, even when the tainted evidence does not implicate constitutional or statutory rights." *Id.*

In *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), federal agents interrogated the defendants for two days without arraigning them, as a federal statute required. 318 U.S. at 333–338, 63 S.Ct. 608. The defendants challenged the admission of their confessions on the ground of coercion. *Id.* at 338–39, 63 S.Ct. 608. The Court, declining to reach the coercion issue, held that its "supervisory authority over the administration of criminal justice in the federal courts" required it to exclude the evidence. *Id.* at 341, 63 S.Ct. 608. McNabb reasoned that exclusion was necessary to avoid "making the courts themselves accomplices in willful disobedience of law." *Id.* at 345, 63 S.Ct. 608. In addition, the Court justified invoking the supervisory power on the basis of courts' responsibility for "establishing and maintaining civilized standards of procedure" beyond the minimal protections of due process. *Id.* at 340, 63 S.Ct. 608. Thus, the *McNabb* Court invoked the supervisory power to maintain the integrity of the criminal justice system and to enhance procedural protection for criminal defendants. Brady, Matthew, *A Separation of Powers Approach to the Supervisory Power of the Federal Courts*, 34 Stan. L.Rev. at 430.[16]

---

**15.** We emphasize that while Clark may have been affected by the improper actions of the HPD, the wrongdoing here was by the HPD to the DEA in improperly seeking the subpoena at issue, and to the integrity of the court system by using the fruits of such impropriety in a criminal proceeding.

**16.** Brady observes that

> After *McNabb*, the Court excluded much evidence even when police had not violated defendant's constitutional rights or violation of those rights did not a fortiori call for exclusion. *See Anderson v. United States*, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943) (companion case to *McNabb*; illegal interrogation by state police working in cooperation with federal agents); *Rea v. United States*, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956) (evidence seized under illegal warrant suppressed in federal court; federal officer enjoined from turning evidence over to state officials for use in state prosecution); *Benanti v. United States*, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957) (evidence seized by state officials in violation of federal law); *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (evidence illegally seized by state officials excluded from federal court).

> On the other hand, the Court has often refused to exclude evidence under the supervisory power. *See, e.g., Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) (tape recording of incriminating conversation between IRS agent and defendant); *Cleary v. Bolger*, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390 (1963) (state official invited to attend illegal interrogation; Court refused to enjoin state official from testifying in state court as to outcome of interrogation); *Wilson v. Schnettler*, 365 U.S. 381, 81 S.Ct. 632, 5 L.Ed.2d 620 (1961) (after illegal seizure, federal agents turned evidence over to state officials; Court dismissed case for failure to allege lack of adequate remedy at law); *On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952) (federal agent testified as to incriminating conversation between defendant and an informer, when the informer carried a concealed transmitter); *cf. Sherman v. United States*, 356 U.S. 369, 378, 78 S.Ct. 819, 2 L.Ed.2d 848 (1956) [(1958)] (Frankfurter, J., concurring) (majority takes subjective view of entrapment defense focusing on defendant's predisposition to commit crime; concurrence takes objective view focusing on propriety of government conduct).

> Lower courts have also exercised the supervisory power. *See, e.g., United States v. Cortina*, 630 F.2d 1207 (7th Cir.1980) (misstatements by officials in obtaining a search warrant led to exclusion of evidence); *United States v. Valencia*, 541 F.2d 618, 622–23 (6th Cir.1976) (information obtained from defendant's attorney's secretary could not be used to convict); *United States v. Hanson*, 469 F.2d 1375 (5th Cir.1972) (evidence obtained in violation of the Federal Rules of Criminal

In *Dimon v. Mansy*, 198 W.Va. 40, 479 S.E.2d 339 (1996), a case concerning the scope of 41(b) of the West Virginia Rules of Civil Procedure and the circuit court's discretion to dismiss a case as a sanction for a failure to prosecute, this Court recognized the *McNabb* rule when we discussed our inherent authority to protect our judicial proceedings. We stated,

[i]n the course of discharging their traditional responsibilities, circuit courts are vested with inherent and rule authority to protect their proceedings from the corrosion that emanates from procrastination, delay and inactivity. Thus, the determination whether the plaintiff has failed to move the case in a reasonable manner is a discretionary call for the circuit court. The power to resort to the dismissal of an action is in the interest of orderly administration of justice because the general control of the judicial business is essential to the trial court if it is to function.

. . . .

The extent of this discretionary authority, however, must be delimited with care, for there is always the unseemly danger of overreaching when the judiciary undertakes to define its own power and authority. Guided by this limitation, we have suggested that a circuit court's sanction authority be a reasonable response to the problems and needs that provoked its use. *See Bartles v. Hinkle*, 196 W.Va. 381, 390, 472 S.E.2d 827, 836 (1996) ("In formulating the appropriate sanction, a court shall be guided by equitable principles."). In other words, a court's authority to issue dismissals as a sanction must be limited by the circumstances and necessity giving rise to its exercise.

. . . .

It is our task to supervise the administration of justice in the circuit courts, and to that end, we must ensure that fair standards of procedure are maintained. Judicial supervision and responsibility "implies the duty of establishing and maintaining civilized standards of procedure and evidence." *McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943). Our supervisory and rulemaking authority extends to issuance of sanctions under Rule 41(b), particularly when we are dealing with a procedure for which a uniform practice is desirable. As suggested below, other appellate courts have found that exercise of their authority is appropriate when needed to guarantee litigants fair access to the courts to have their grievances heard on the merits. Of course, our supervisory and rulemaking authority is not a form of free-floating justice, untethered to legal principle. Attempts by an appellate court, for example, to use broad supervisory and rulemaking authority as a way to control the properly vested discretion of the trial court should be squarely rejected. But, on occasion . . . we must act to secure rights and fairness when we are persuaded a procedure followed in a trial court is wrong.

---

Procedure excluded); *Navarro v. United States*, 400 F.2d 315 (5th Cir.1968) (violation of the Federal Rules of Criminal Procedure); *Birdsell v. United States*, 346 F.2d 775, 782 n. 10 (5th Cir.), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965) (federal agents inducing foreign agents to gather evidence improperly); *United States v. Payner*, 434 F.Supp. 113 (N.D.Ohio 1977) (illegal search of third party's briefcase), aff'd per curiam, 590 F.2d 206 (6th Cir.1979), rev'd, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980).

Lower courts have also, however, refused to exercise the supervisory power. *See, e.g., United States v. Briola*, 660 F.2d 763 (10th Cir. 1981) (facts very similar to those in *Payner*); *United States v. Maher*, 645 F.2d 780 (9th Cir. 1981) (cooperation between federal and foreign investigators); *United States v. Penn*, 647 F.2d 876 (9th Cir.1980) (bribe of defendant's 5-year-old son to disclose the location of heroin that the defendant had hidden); *United States v. Searp*, 586 F.2d 1117 (6th Cir.1978) (violation of internal regulations by police); *United States v. Fernandez–Guzman*, 577 F.2d 1093 (7th Cir.1978) (refused to apply the *McNabb* rule to unrelated police conduct); *United States v. Rose*, 570 F.2d 1358 (9th Cir. 1978) (cooperation between federal and foreign agents in improper conduct); *United States v. Leja*, 563 F.2d 244 (6th Cir.1977) (entrapment); *United States v. Harrington*, 504 F.2d 130 (7th Cir.1974) (improper search warrant); *United States v. Jannotti*, 501 F.Supp. 1182 (E.D.Pa.1980) (entrapment); *United States v. Baskes*, 442 F.Supp. 322 (N.D.Ill. 1977) (multiple representation); *United States v. Narducci*, 341 F.Supp. 1107 (E.D.Pa.1972) (wiretapping).

*Id.* at 45–46, 479 S.E.2d at 344–45.[17] "This Court's inherent power has its source in at least three places: (1) in the constitutional separation of powers of the three branches of government; (2) in the general supervisory power of this Court; and (3) in the power of the Court over the conduct of members of the State Bar." *In re Watkins,* 233 W.Va. 170, 177, 757 S.E.2d 594, 601, 2013 WL 1285995, at *10 (March 26, 2013). "The first inherent source arises in the separation of powers doctrine." *Id.* "Article v. of the *West Virginia Constitution* says that [t]he legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others[.]" *Id.* The Constitution goes on to state that "[t]he judicial power of the State shall be vested solely in a supreme court of appeals and in the circuit courts ... and in the justices, judges and magistrates of such courts." Article VIII, section 1.

▬▬▬ The separation of powers doctrine implies that each branch of government has inherent power to "keep its own house in order," absent a specific grant of power to another branch, such as the power to impeach. *Watkins,* 233 W.Va. at 181, 757 S.E.2d at 605, 2013 WL 1285995, at *11. (citing James Duke Cameron, *"The Inherent Power of a State's Highest Court to Discipline the Judiciary,"* 54 Chicago Kent L.Rev. 45, 49 (1977)). This theory recognizes that each branch of government must have sufficient power to carry out its assigned tasks and that these constitutionally assigned tasks will be performed properly within the governmental branch itself. *Id.* "Second, the Constitution gives this Court the power to oversee the administration of justice in the courts of this State." *Id.* The Constitution grants to the Supreme Court "general supervisory control" over all circuit courts, family courts and magistrate courts, and makes the chief justice 'the administrative head of all the courts.' *See* "article VIII, sections 3 and 16." *Id.*

As one commentator aptly notes,

[t]he principle of separation [of powers] calls for judicial restraint in excluding evidence that the executive branch offers; the principle of balance requires that the Court exclude evidence that conflicts with its fair administration of the criminal justice system.... Courts are both impartial arbiters of disputes and truth-seekers. But more importantly, courts must also maintain the propriety of the criminal justice system, which involves more than merely enforcing the Bill of Rights. Rather, they must use the supervisory power to maintain both their institutional integrity and the institutional power of all three branches of government. This conception of the judicial function (and the supervisory power) implies that the courts, under a system of checks and balances, have a duty to guard against the executive branch's abuse of its article II power to enforce the law. Otherwise, courts abdicate both their

---

**17.** This Court has also discussed *McNabb* in the context of a criminal action in *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261 (1982), wherein we determined that a defendant's second confession was not voluntary in view of the delay in taking the defendant before a magistrate after his arrest. We stated,

the United States Supreme Court has also recognized that *apart from any constitutional grounds* there is a procedural requirement that a person who has been arrested be taken before a magistrate without unreasonable delay. This principle was first enunciated in *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1942), and later confirmed in *Mallory v. United States,* 354 U.S. 449, 452–53, 77 S.Ct. 1356, 1358, 1 L.Ed.2d 1479, 1482 (1957), where the Court quoted this portion from *McNabb:*

"The awful instruments of the criminal law cannot be entrusted to a single functionary.

The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication. Legislation such as this, requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. For this procedural requirement checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime."

*Id.* at 132–33, 286 S.E.2d at 268 (emphasis added).

responsibility and their ability to check governmental excesses ... Therefore, courts in a system of checks and balances have authority to exclude evidence on a discretionary basis, even when the government has not violated a statutory or constitutional prohibition.

Brady, Matthew, *A Separation of Powers Approach to the Supervisory Power of the Federal Courts*, 34 Stan. L.Rev. at 443–44 (citations omitted).

█ In acting to protect and preserve the integrity of the judicial system, the Court should weigh a number of factors in considering whether improperly obtained evidence should be suppressed. Where evidence is obtained improperly by the State from a third party, the Court should balance between the societal interest in maintaining a prosecution and the need of a court system to maintain public respect and integrity. Factors such as deterring and/or discouraging similar misconduct in the future, the overall procedural fairness for the criminal defendant and the animus of the State in acting improperly are integral to this inquiry.

In this case, we find that the societal interest in maintaining this prosecution weighs in favor of allowing the evidence in question to be presented. One factor we strongly consider in deciding whether suppression is appropriate in this particular case is that the egregious conduct at issue did not violate Clark's Fourth Amendment rights. *See U.S. v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). Additionally, when we review the facts in the record before us, it is apparent that if Officer McMillian had properly sought a warrant for Clark's phone records, he undoubtedly would have been able to obtain one. Officer McMillian observed that Clark was the one employee who was present for both the July 2009 and October 2009 robberies. McMillian also testified during trial that when he reviewed the video from the July 2009 robbery, he found both the robber and Clark's behavior suspicious. He noted that the robber allowed Clark to go to the phone on the wall and make a call to the manager, even though the robber did not know if it was an in-house phone or if Clark had the ability to make an outside call on it.

McMillian noted that after the call, the robber then turned his back on Clark. At one point, the robber appeared relaxed enough to even put his hand on the wall. He also observed that the robber hit another cinema employee during the robbery but never touched Clark.

We believe that McMillian's observations, in conjunction with Combs' suspicions regarding how Clark obtained a new motorcycle, jacket and helmet after the July robbery, would have collectively been enough evidence for a search warrant to be issued by a judicial officer for Clark's phone records. Thus, the fact that the phone records could have been obtained by proper, lawful means leads us to conclude that the cost to society of excluding the records in this case and, thus, vindicating Clark of convictions for two counts of first degree robbery and two counts of conspiracy outweighs the other interests at stake. Accordingly, for the foregoing reasons, we conclude that the circuit court's amended order denying Clark's motion to suppress should be affirmed.

## IV.

## CONCLUSION

For the above-stated reasons, we affirm Clark's conviction of two counts of first degree robbery and two counts of conspiracy.

Affirmed.

Justice WORKMAN and Justice LOUGHRY concur and reserve the right to file concurring opinions.

WORKMAN, Justice, concurring:

I concur with the majority's conclusion that petitioner herein suffered no constitutionally protected invasion of privacy; therefore, the subject phone records and the fruits thereof were admissible. However, I write separately to express my disagreement with the majority's improper substitution of its own credibility findings for that of the trial court below, resulting in the erroneous conclusion that the administrative subpoena herein was improperly obtained. Moreover, while I agree wholeheartedly that this Court has the inherent supervisory authority to

500

maintain the integrity of the criminal justice system, I believe that integrity is well-maintained in the case *sub judice* through the simple application of the existing rule of law.

On remand, the trial court was instructed to receive evidence relative to whether the DEA's issuance of the administrative subpoena at issue was related to investigation of controlled substances. The trial court heard testimony that petitioner was observed by Sergeant Combs, a Huntington Police Department officer and federally deputized drug task force officer, as having a new motorcycle, jacket, and helmet. Sgt. Combs was aware that petitioner resided in government housing[1] and inquired of the petitioner how he acquired the items; petitioner claimed he had received an advance of money for joining the military, which Sgt. Combs discovered to be untrue. Upon further inquiry, the Assistant Manager at Marquee Cinema advised Sgt. Combs that petitioner was believed to be involved in the sale of marijuana. Sgt. Combs advised Agent Bevins of the DEA about his suspicions regarding petitioner's involvement in the robbery and drug activity, and further requested Agent Bevins to issue the subject administrative subpoena.[2] Sgt. Combs and Agent Bevins both testified that dual investigations of drugs and other crimes is very common as the two are frequently intertwined and often yield evidence of both.[3] As a result of this testimony, the trial court found that this information formed the basis of the administrative subpoena and was "material and relevant to a drug-related investigation[.]"

The majority properly recognizes our standard of review for a motion to suppress, which standard holds that the trial court's findings of fact are to be set aside only when

they are clearly erroneous. *State v. Lilly*, 194 W.Va. 595, 600, 461 S.E.2d 101, 106 (1995). In spite of this long-standing provision, the majority then disregards the trial court's above findings of fact solely because it finds that the subpoena was "suspicious on its face" and the State failed to provide a "believable [ ] explanation" for the scope of the subpoena. Without question, the majority's handling of this issue smacks of credibility determinations which are plainly within the purview of the trial court to resolve: "On appeal, legal conclusions made with regard to suppression determinations are reviewed de novo. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, *factual findings based, at least in part, on determinations of witness credibility are accorded great deference.*" Syl. Pt. 3, *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994) (emphasis added).

In particular, the majority is critical of the State's failure to mention a drug investigation during the preliminary hearing. However, as evidenced by the testimony on remand, no drug activity was ultimately discovered during the course of this investigation and certainly no charges were brought against petitioner in that regard. To that end, it is quite understandable that at the preliminary hearing for the robbery charges, there would be little if any utility in mentioning the suspected drug nexus. Moreover, as to the majority's concern about the date restriction in the subpoena to the dates surrounding the July robbery, the DEA agent who issued the subpoena testified that it was customary to restrict the time period sought otherwise the information was "too much to process."

1. Petitioner resided at Marcum Terrace, a community which Sgt. Combs testified was well-known for drug activity.

2. Sgt. Combs testified that he investigated petitioner further, but uncovered no further information supportive of a drug offense.

3. Agent Bevins testified:
Q. And what is often times the link between drugs and, for instance, robberies?
A. Money. They need money. They need quick money to pay back their dealers or get quick cash to make another purchase.

Q. So there have been numerous other instances where you have issued subpoena duces tecums for phone records where the case involved both a drug investigation or a drug nexus, as you call it, and other criminal activities possibly being involved?
A. Hundreds over the years.
Sgt. Combs further testified: "[I]t's not uncommon for individuals involved in the drug trade or other criminal activity to commit robberies, home invasions to fund their activity, start-up money, stuff like that."

In sum, the State presented three witnesses, two of whom testified under oath that they were investigating or were aware of a parallel investigation of petitioner for crimes involving controlled substances.[4] This testimony was unrefuted. The trial court found the witnesses reliable and credible and, as a result, concluded that there existed a sufficient drug nexus to warrant issuance of the administrative subpoena. The majority has, in so many words, suggested that these law enforcement officers have collusively manufactured testimony to support the use of the administrative subpoena. Such a brazen insinuation without any evidentiary basis clearly undermines our long-held directive that witness credibility issues are to be afforded great deference by this Court. To that end, I disagree with the majority's conclusion that the administrative subpoena was improperly issued and that petitioner has presented no evidence to establish that the trial court's findings on that issue were clearly erroneous.

Nevertheless, the majority then seizes upon what I believe to be the critical issue presented herein and properly concludes that, the circumstances surrounding the issuance of the subpoena notwithstanding, petitioner has no reasonable expectation of privacy in his phone records. This position is in accord with *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), and a number of other states. As such, I believe the majority's analysis is properly ended with this conclusion of law. However, the majority improvidently proceeds with a lengthy narrative culminating in the creation of two new, unnecessary syllabus points which conflate the resolution of evidentiary challenges

with the inherent authority of this Court to maintain the integrity of the criminal justice system.

As noted above, I take no issue with the majority's description of this Court's authority and *responsibility* to the proper administration of justice; however, I believe that this case calls for no more than the proper application of the rule of law. As discussed above, proper application of the deferential standard of review yields the conclusion that the trial court committed no error in determining that the subpoena was properly issued and properly released to local officials likewise engaged in the "enforcement of laws related to controlled substances." 28 C.F.R. § 0.103 (2002). As the majority itself notes, it "would have no issue with the State's use of records obtained through a legitimately obtained DEA subpoena if a violation of state law also happened to be discovered in the process of investigating a federal drug crime[.]" Had the majority properly applied the standard of review, it would find itself faced with precisely this scenario and, therefore, properly able to affirm the trial court's ruling on that basis.

Moreover, as demonstrated by the majority, thorough analysis of the Fourth Amendment of the United States Constitution and Article II, Section 6 of the West Virginia Constitution, further leads to the conclusion that petitioner's constitutionally protected expectation of privacy has not been disturbed by production and use of his phone records. Nevertheless, the majority wields this Court's supervisory powers over the courts and constitutional duty to ensure the proper administration of justice as a tool to justify an otherwise well-supported legal determina-

---

4. Sgt. Combs testified:

 A. I asked DEA Agent Tom Begins, explained to him, I said, "I think this individual, Mr. Clark, had committed these robberies and I think he might be selling drugs also—marijuana."

 * * *

 Q. And you suspected both that he was dealing in drugs as well as possibly a suspect in this robbery?

 A. Yes.

 Q. And did you tell Agent Bevins both of those things?

 A. Yes.

 * * *

 Q. . . . . [Y]ou were suspicious of both drug activity and that he was also a possible suspect in the robbery?

 A. Yes.

With regard to the information provided by Sgt. Combs which led to the issuance of the administrative subpoena, Agent Bevins corroborated Sgt. Combs' testimony: "[I]n summary he advised that he had information that the Defendant was selling marijuana; that he was purchasing items that were above his qualifications in life; and that he believed he was involved also in robberies." The State's third witness, Officer McMillian, testified that he was involved only in the robbery investigation and had no personal knowledge outside of that investigation.

tion, thereby inviting allegations of judicial overreaching. While I appreciate a thoroughly reasoned opinion which may serve as an academic primer on particular points of law, the majority's final analysis more closely approximates academic puffery. Such an endeavor is particularly dangerous where constitutional concerns are present and such pontification results in two syllabus points which purport to allow this Court to supplant the rule of law in the name of amorphous "societal interests."

For these reasons, I respectfully concur. I am authorized to state that Justice Loughry joins me in this concurrence.